IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALBERTA QUIAH, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | CIVIL ACTION |
| v. | : | No. 19-4630 |
| | : | |
| THE DEVEREUX FOUNDATION, INC., ET AL., | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

McHUGH, J.                                                                                                      June 19, 2020

**MEMORANDUM**

    This is a case brought by a former employee of a care facility for developmentally disabled individuals who was relentlessly pursued for alleged thefts from her former employer. The Defendants include her employer, the local police department, the county government, and various prosecutors. Plaintiff maintained her innocence throughout the criminal proceedings, but Defendants offered to drop the charges only if Plaintiff paid her employer the requested restitution, despite what Plaintiff maintained was a lack of evidence of guilt. The case ultimately went to trial where Plaintiff was exonerated by a jury.

    If the facts alleged are true, Plaintiff describes a troubling series of events. Nonetheless, her various federal claims must fail because she has not pled facts necessary to support essential elements of her claims. I am therefore compelled to grant Defendants' Motion to Dismiss her federal claims, but will dismiss Plaintiff's supplemental state law claims without prejudice for consideration by Pennsylvania courts.

I.      **The Facts as Pleaded**

   A. **Employment, investigation, and termination**

The Devereux Foundation is a Pennsylvania corporation that provides supportive services, including housing, to developmentally disabled adults.  ECF 17, Am. Compl. ¶ 5. Plaintiff applied for a position with Devereux and was hired as a Direct Support Professional ("DSP") in July 2010.  *Id*. ¶ 21.  In that capacity, Plaintiff was tasked with caring for individual residential clients, and in doing so was responsible for making purchases for clothing, personal care items, food and other items using client funds held on account for them by Devereux.  *Id*. ¶ 22.  In addition, Plaintiff, as a DSP, also was able to use some funds from Devereux ("house funds") to maintain group residential housing and provide for group meals.  *Id*. ¶ 23.

In November 2011, Plaintiff was promoted to Program Supervisor.  *Id.* ¶ 25.  In this role, Plaintiff supervised the DSPs that staffed two residential houses.  *Id*.  Plaintiff also was responsible for accounting for the DSPs' use of client funds, in addition to distributing house funds provided by Devereux and tracking their use.  *Id.* ¶ 27.  In the role of Program Supervisor, Plaintiff reported to Sharon Famous, the Financial Assistant in Devereux's Business Office, and performed reconciliations between the funds provided to her by Devereux and the expenditure of those funds by DSP staff on a monthly basis.  *Id*. ¶¶ 27, 29.  More specifically, Plaintiff was responsible for the management of forms that documented her distribution of funds to DSP staff, the purchases made by staff with the funds, and included receipts provided by DSP staff as evidence of these purchases.  *Id*. ¶ 29.  These forms were reviewed and approved by Famous.  *Id*. Plaintiff would occasionally assume DSP duties and make purchases using both client and house funds when Devereux was short-staffed, but these purchases rarely if ever included clothes.  *Id.* ¶ 34.

On or around April 27, 2015, Plaintiff was called in for a meeting with an investigator from Devereux to discuss an issue with a reconciliation she submitted. *Id*. ¶ 35. One of the receipts submitted as part of the reconciliation stated it was a duplicate, which raised concerns with Devereux's Quality Assurance department. *Id*. Even though the items contained in the receipts were shortly located with clients, Devereux commenced a fuller investigation into the reconciliations provided by Plaintiff for the prior year, led by its Quality Assurance Manager Shannon Jones. *Id.* ¶ 40.

Plaintiff was notified the day following her meeting with the investigator that she was being suspended without pay pending the results of the investigation and escorted off the premises. *Id.* ¶ 41. Jones finished his investigation by May 15, 2015, presenting Plaintiff with his reported findings in an interview that day. *Id*. ¶¶ 43-44. Jones found that approximately 16 duplicate receipts had been submitted as part of reconciliations involving Plaintiff. *Id.* ¶¶ 44-45. Plaintiff maintained that she had not made any of the purchases at issue in Jones's report, and that she followed reconciliation procedures as she had been instructed. *Id.* ¶ 46. Sharon Famous was not present at this meeting, and Plaintiff further contends that Devereux made no attempts to interview Famous prior to initiating criminal proceedings against her. *Id.* ¶ 49. Plaintiff was asked to provide $1,266.58 in restitution to Devereux at the May 15 meeting, the amount that Jones determined was unaccounted for in the report. *Id.* ¶ 58.

Plaintiff provided a written statement to Devereux after her May 15 meeting providing alternative explanations for the inconsistencies, but purportedly Jones never sought to corroborate those explanations. *Id*. ¶ 56. Instead, on May 27, 2015, Plaintiff was informed that her employment was being terminated. *Id.* ¶ 59. Devereux again requested that Plaintiff pay $1,266.58 in restitution, warning her that a criminal complaint would be filed against her if she

did not comply. *Id.* Plaintiff refused, maintaining that she had done nothing wrong. *Id.* Plaintiff later received a letter dated May 29, 2015, confirming termination of her employment and setting a June 2, 2015, deadline for paying the requested restitution before law enforcement would be contacted and charges filed against her. *Id.* ¶ 61. Plaintiff contends that Devereux sought to use her as a scapegoat for its "shoddy" practices in documenting the use of its state and federal funds. *Id.* ¶ 89.

### B. The Unemployment Compensation proceedings

Plaintiff submitted a claim for Unemployment Compensation ("UC") benefits following her termination. *Id.* ¶ 60. Plaintiff's UC application was originally denied based on Devereux's allegations of Plaintiff's misconduct, which led to her retaining her current counsel. *Id.* ¶ 63. Plaintiff appealed the denial of her UC application, and at the subsequent hearing multiple witnesses testified on behalf of Devereux, including Jones. *Id.* ¶¶ 65-71. The denial of UC benefits was reversed based on a finding that Plaintiff was not guilty of the alleged misconduct, *id.* ¶ 77, a ruling affirmed by the UC Board of Review, *id.* ¶ 114.

### C. Easton Township Police Department investigation

In the interim, in May 2015, Jones, the Quality Assurance Manager, contacted the Easton Township Police Department ("ETPD"), reporting that Plaintiff had misused $1,266.58 of client funds. *Id.* ¶ 83. According to Plaintiff, she was falsely accused of going to multiple retail stores and restaurants with the funds. *Id.* Plaintiff alleges that the ETPD never conducted an independent investigation into the facts of the case, but merely took Devereux's claims at face value. *Id.* ¶ 85.

Devereux supplied investigative materials to Detective James Sesher, *id.* ¶ 87, who later informed Plaintiff's counsel by email that he was investigating Plaintiff for the alleged thefts, *id.* ¶¶ 97-98. When Detective Sesher notified Plaintiff's counsel that he intended to file a criminal

complaint against Plaintiff, counsel responded within an hour, stressing his view that the evidence was insufficient to provide probable cause or support a prima facie case. Sesher nevertheless filed the complaint, containing 64 counts of theft-related offenses. *Id*. ¶¶ 104-107. Plaintiff pleads that Sesher and Jones specifically discussed the shortcomings of the investigation and the likelihood that a Magistrate would not authorize an arrest warrant, and that such shortcomings were dealt with by filing a criminal complaint intended to obtain leverage in collecting the requested restitution. *Id*. ¶ 90.

At a Preliminary Hearing for the charges in December 2015, when Plaintiff's counsel approached both Detective Sesher and the Assistant District Attorney handling the prosecution with an offer to review the UC decisions, both purportedly stated that the matter was in the hands of Devereux. *Id*. ¶¶ 115-116. Of the 64 counts of theft-related conduct in the original criminal complaint, the prosecutor dropped all but two—allegedly because of the weakness of the case—but added a third one. *Id*. ¶¶ 117, 120. According to Plaintiff, a Devereux witness testified falsely at the hearing and omitted critical details about the reconciliation process generally. *Id*. ¶¶ 121, 124. The Magistrate Judge ruled that the three remaining charges would be held over for trial and Plaintiff was released on her own recognizance. *Id*. ¶¶ 125-126.

D. **Chester County District Attorney's investigation and trial**

The prosecution was assigned to Chester County Assistant District Attorney Alex Gosfeld, who Plaintiff alleges was aware of the lack of evidence supporting the charges but agreed to pursue the case at Devereux's behest. *Id*. ¶¶ 129-130. During various conversations, Gosfeld purportedly acknowledged that it was a "very weak case" but refused to drop charges,

only offering a guilty plea that Plaintiff refused. *Id*. ¶¶ 122a-127a.[1] Plaintiff then alleges that requests by her counsel for exculpatory materials were frustrated both by the prosecution and by Devereux, which failed to respond appropriately or completely to a records subpoena. *Id*. ¶¶ 118a-151. Among other things, Plaintiff alleges that Devereux did not share its complete report with either the ETPD or the prosecutor's office. *Id*. ¶ 120a.

In March 2017, the case was transferred from Gosfeld to Assistant District Attorney Samantha Ryan. *Id*. ¶ 162. On June 6, 2017, a mere two weeks before trial, Ryan produced additional discovery that was responsive to Plaintiff's subpoena request, including flow sheets documenting petty cash and client account funds disbursements. *Id*. ¶ 165. The trial was consequently postponed, and Ryan continued to share additional discovery with Plaintiff. *Id*. ¶¶ 167-171. In light of the new revelations, Plaintiff's counsel once more asked Ryan to drop the prosecution due to the weakness of the case and Devereux's alleged bad faith behavior, but Ryan instead amended the charges to include three additional theft-related counts. *Id*. ¶¶ 170, 172. On July 17, after the call of the list for the criminal trial, Ryan extended an offer to withdraw all criminal charges if Plaintiff agreed to pay Devereux an agreed amount of restitution, ostensibly at the direction of Devereux, which Plaintiff again refused. *Id*. ¶ 174-175.

Trial finally commenced in September 2017, where, despite testimony by various Devereux staff, Plaintiff was found not guilty by a jury. *Id*. ¶¶ 177-183. Plaintiff further alleges that the presiding judge advised the jury that he would have overturned their verdict had they found Plaintiff guilty. *Id*. ¶ 184.

---

[1] Some numbers in the Plaintiff's Amended Complaint repeat themselves. The second entries have been affixed with "a".

Based on these allegations, Plaintiff brings (1) false arrest claims under the Fourteenth Amendment and state law against Devereux, ETPD, and Sesher; (2) claims of malicious prosecution under the Fourth Amendment, Fourteenth Amendment, and state law against all Defendants, including a claim against Chester County under *Monell v. Department of Social Services*, 436 U.S. 658 (1978);[2] and (3) federal conspiracy claims under 42 U.S.C. § 1985 against all Defendants.[3]

## II.     Standard of Review

In this Circuit, motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

## III.    Discussion

Plaintiff fails to state a claim under federal law because she does not plead the essential elements of arrest or detention.  Without an underlying constitutional violation, her *Monell* and conspiracy claims fail as well.[4]  It is possible that Plaintiff's claims might fare better under

---

[2] This appears to be the claim alleged in Count III of the Amended Complaint, which is simply captioned "Violation of 42 U.S.C. § 1983," but refers throughout to "policies, customs, or practices that were recklessly and deliberately indifferent to the violation of the civil rights of citizens."  Am. Compl. ¶ 211.

[3] Plaintiff also makes reference in her briefing to a claim for "abuse of process."  Pl. Br. 40-41, ECF 27.  It is unclear whether she is making such a claim under state law, federal law, or both.  Regardless, as Plaintiff had the opportunity to include such a claim in her Amended Complaint but did not, it would be improper to consider it here.

[4] As to Devereux, a private corporation which is regulated by and receives funds from the Commonwealth, there is a threshold question as to whether it is a state actor for the purposes of § 1983 liability.  *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).  I do not reach that issue because Plaintiff fails to state a claim even if Devereux is deemed a state actor.

7

Pennsylvania law, and I will dismiss those claims without prejudice for her to pursue them in state court.

### A. Plaintiff cannot show that she has been "seized" as required to plead malicious prosecution or false arrest pursuant to 42 U.S.C. § 1983

Under the Third Circuit's standard for successfully pursuing a § 1983 action for malicious prosecution, a plaintiff must show (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003). Plaintiff's counsel candidly acknowledges that the fifth element is "the hardest element for Plaintiff to meet," particularly as she was not incarcerated at any point. Pl. Br. at 35, ECF 27.

Two Third Circuit cases set the bounds for determining when an individual has suffered a deprivation of liberty consistent with the concept of a Fourth Amendment seizure: *Gallo v. City of Philadelphia*, 161 F.3d 217 (3d Cir. 1998), and *DiBella v. Borough of Beachwood*, 407 F.3d 599 (3d Cir. 2005). In *Gallo*, the plaintiff brought a malicious prosecution claim against the City of Philadelphia and assorted federal and municipal officials after being acquitted of charges that he deliberately set fire to his business. *Id*. at 218. After indictment, the plaintiff was released on a $10,000 personal recognizance bond but was not allowed to travel beyond Pennsylvania or New Jersey. *Id.* at 219. Moreover, the plaintiff had to contact Pretrial Services on a weekly basis. *Id.* These requirements lasted over eight months, until the conclusion of his trial. *Id.*

Although the plaintiff was not ever arrested, detained, or handcuffed, the Court determined that these pretrial restrictions were sufficient to show that plaintiff was seized,

8

defining seizure as "a show of authority that restrains the liberty of a citizen" or "government termination of freedom of movement intentionally applied." *Id*. at 223. In adopting these definitions, the Third Circuit embraced the reasoning of Justice Ginsburg's concurrence in *Albright v. Oliver*, 510 U.S. 266 (1994), which views seizure as continuing from the moment of initial physical custody to non-physical restraints imposed upon defendants to secure their subsequent appearances in court. *Albright*, 510 U.S. at 278 (Ginsburg, J., concurring) ("The common law thus seems to have regarded the difference between pretrial incarceration and other ways to secure a defendant's court attendance as a distinction between methods of retaining control over a defendant's person, not one between seizure and its opposite."); *see also Schneyder v. Smith*, 653 F.3d 313, 320 (3d Cir. 2011) ("[T]he difference between detention in jail, release on bond, and release subject to compliance with other conditions is in the *degree* of restriction on the individual's liberty, not in the *kind* of restriction.") (citations omitted). Courts must therefore look to the specific restrictions at issue in each case to determine whether a seizure has occurred.

Plaintiff here does not plead that she was detained, required to post bail, report to Pretrial Services, or limit her travel, but only that she was required to attend hearings related to the criminal charges. The Third Circuit has squarely held that compulsion to attend hearings by itself does not constitute seizure. In *DiBella*, as contrasted with *Gallo*, the plaintiffs were never arrested, did not have to post bail, incurred no travel restrictions, and did not have to keep contact with Pretrial Services. On those facts, the Court held they did not experience a Fourth Amendment seizure, notwithstanding the requirement of their attendance at trial, with the result that they "failed to state a cause of action for malicious prosecution" under § 1983. *DiBella*, 407 F.3d at 603.

Plaintiff also seeks to assert a claim of malicious prosecution under the Fourteenth Amendment, contending that *Torres v. McLaughlin*, 163 F.3d 169 (3d Cir. 1998), provides the authority to do so.  In *Torres*, decided a few weeks after *Gallo*, the Court of Appeals interpreted *Albright* to mean "a section 1983 claim may be based on a constitutional provision other than the Fourth Amendment," as long as that claim is "governed by explicit constitutional text" and "not grounded in substantive due process." *Id*. at 172.  This appears to contradict *Gallo*, because there the Court made clear that "the constitutional violation is the deprivation of liberty accompanying the prosecution," and thus that the court below was "correct in focusing on the seizure issue in evaluating Gallo's claim."  *Gallo*, 161 F.3d at 222.  *Gallo* was not mentioned by the majority in *Torres* but was cited by the dissent.

Thereafter, in *Schneyder*, the Third Circuit explicitly recognized the conceptual tension between *Gallo* and *Torres* and endorsed *Gallo*.  It characterized the relevant language in *Torres* as "dicta" and held that the fact that it was decided after *Gallo* "leav[es] its precedential value" in jeopardy.  *Schneyder*, 653 F.3d at 321.  Taken in combination, *Gallo* and *Schneyder* make clear that a Fourth Amendment "seizure" is necessary, with the result that Plaintiff may not invoke the Fourteenth Amendment as the basis for a § 1983 malicious prosecution claim.

Finally, Plaintiff's false arrest claim under § 1983 fails for the same reason that her malicious prosecution claim fails.  In order to properly plead false arrest, Plaintiff must show she experienced "an arrest without probable cause."  *Patzig v. O'Neil*, 577 F.2d 841, 848 (3d Cir. 1978).  The Third Circuit has also held that "[a] false imprisonment claim under § 1983 which is based on an arrest made without probable cause is grounded in the Fourth Amendment's guarantee against unreasonable seizures."  *Groman v. Twp. of Manalapan*, 47 F.3d 628, 636 (3d

Cir. 1995). Because Plaintiff was not arrested or seized, as discussed above, Plaintiff has failed to state a claim for false arrest.

### B. Because Plaintiff has not pled an underlying violation of federal law, her § 1983 *Monell* claim fails

As noted above, Count III of the Amended Complaint, captioned "Violation of 42 U.S.C. § 1983," refers throughout to "policies, customs, or practices that were recklessly and deliberately indifferent to the violation of the civil rights of citizens." Am. Compl. ¶ 211. I treat this as a claim under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Necessarily, this claim fails, as there can be no claim under *Monell* in the absence of an underlying violation of civil rights. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006) (dismissal of § 1983 claims against Mayor required dismissal of *Monell* claims based upon the same factual allegations of unlawful conduct).

### C. Because Plaintiff has not pled an underlying violation of federal law, her conspiracy claim under 42 U.S.C. § 1985 fails

In Count IV of her Complaint, Plaintiff pleads that all Defendants have violated 42 U.S.C. §§ 1983 and 1985, with the subheader "Conspiracy to Deprive of Civil Rights." Am. Compl. ¶ 214. With respect to § 1983 itself, it is axiomatic that it "does not create substantive rights; rather it merely provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws." *Marasco*, 318 F.3d at 505. Because her federal malicious prosecution and false arrest claims fail, Plaintiff cannot invoke § 1983 in a vacuum as the basis for a claim.

As to conspiracy, Section 1985 contains three subsections, and § 1985(3) is concerned with the deprivation of rights or privileges. I will assume Plaintiff is attempting to bring a claim under that specific subsection. *See* 42 U.S.C. § 1985. In order to state a claim under § 1985(3), a plaintiff must allege: (1) a conspiracy; (2) for the purpose of depriving, either directly or

indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy, (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States. *Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006) (quoting *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828-29 (1983)). Even assuming for the purposes of this motion that Plaintiff has satisfied the first three elements of such a claim, Plaintiff cannot satisfy the final element because she has not suffered the deprivation of any federal right or privilege.[5]

### D. Plaintiff's remaining state law claims are dismissed without prejudice

Because I have dismissed all Plaintiff's federal law claims, I may decline to exercise supplemental jurisdiction of Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(c)(3). Indeed, the Third Circuit has held that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)). There is no affirmative justification for exercising supplemental jurisdiction over this matter.

Moreover, there are subtle differences under Pennsylvania law that might provide Plaintiff with a stronger legal basis on which to proceed. After I dismiss Plaintiff's claims on jurisdictional grounds, she may elect to transfer the action to state court under 42 Pa C.S. § 5013. Pursuant to the statute, Plaintiff must file certified transcripts of the final judgment and pleadings from this action. Plaintiff will have the remaining period on the state law statute of limitations

---

[5] Plaintiff's Second Amended Complaint, just filed, does not change the analysis of any of the federal claims.

from the date of filing, with an additional thirty-day grace period, to bring this action into state court. *See* 28 U.S.C. § 1367(d); *see also Artis v. District of Columbia*, 138 S. Ct. 594, 598 (2018).

## IV. Conclusion

For the reasons set forth above, although the facts alleged are concerning, Defendants' Motion to Dismiss must be **GRANTED**. An appropriate Order follows.

s/ Gerald Austin McHugh
United States District Judge

13